Good morning, Your Honors. My name again is Jeff Uttermal. I'm here with my colleagues today, Gary Minkowski and Patrick Ciacciola. May it please the Court. Open dumping of toxic waste is a scourge on the land and can in no way be considered an improvement to real property under any common sense interpretation of that word. From the 1940s on, Honeywell needed to get rid of 3.25 million tons of toxic waste generated at Harbor Point. Harbor Point was one of the largest chromium processing plants in the world. It had a problem on its hand. It had to get rid of lots of waste. It knew it was carcinogenic waste, by the way, from the very beginning. So for decades, it dumped openly. Open dumping, the worst type of dumping. Open dumping of the carcinogenic copper waste at nearby Dundalk, three miles away from Harbor Point. At some point, wasn't there a contract that required them? Didn't the Marine terminals have a contract that required them to place that bill there? Yes, Your Honor. What happened was in 1967, after years, decades of dumping the known-to-be carcinogenic waste, Honeywell irresponsibly sold the copper-created landmass to the state of Maryland. And at that time, Honeywell duped the state and did not provide any warning of what it knew. Honeywell at that time knew that the land would be developed, knew that it would be used by humans, and knew that it would pose a danger to humans. No reasonable purchaser would have purchased that copper landmass knowing what Honeywell knew at that time. So how does that affect, though, a statute of repose? I assume you agree that it's a statute of repose here, not a statute of limitations. Absolutely, Your Honor. So to qualify as an improvement, the toxic dumping must have related positively to the land and occupants. Any alleged betterment must relate positively to both the land and the occupants. And in this regard, Honeywell euphemistically calls its copper, its toxic waste, calls it quality fill. Well, that may be an overstatement, but it did have some positive developments in the sense that it expanded the terminal. And that had some positive developments, even if, as you point out, it had some very serious negative consequences for some of the people who worked there. So how are we supposed to balance those two things? So the Interfaith Court, Interfaith v. Honeywell Federal Court in 2003, affirmed by the Third Circuit, held that any alleged value of hexavalent chromium as supposedly utilitarian fill is, quote, unquote, far outweighed by the danger to health and the environment. And this was a danger of enormous magnitude to health and the environment. Well, but is it clear under Maryland law that that same balance should apply in this context? Maryland law requires in this context a common sense analysis. That's the overarching principle. And under a common sense analysis, the fact that Honeywell at all times knew of the adverse health effects and the fact that this created a threat of enormous magnitude to health and the environment has to be taken into account. So by definition, well, the Interfaith case not only found that the utilitarian purpose was far outweighed, it also found that Cooper had full knowledge, that Honeywell had full knowledge of the adverse effects, adverse health effects, including lung cancer. Interfaith Court specifically found that. But, you know, in reading the statute of proposed, there's nothing in there talking about knowledge of the parties or anything like that. It just seems to be a fairly straightforward statute that says that any improvement in real property that occurs more than 20 years after the date first becomes available for its intended use. That seems like a very objective test. It doesn't get into the subjective intent of a party and what it was doing with respect to a particular landfill. Well, by case law it does, Your Honor. In the Hickman case, Maryland 2001, the toxic dumping here is analogous and can be easily analogized to the graveyard desecration in Hickman. And there was knowledge of the graveyard desecration. That was not something done without knowledge. There, the removing tombstones was not an integral component of real estate development. It was not a reasonably necessary component of development. And the same is true here. Just like knocking down tombstones with Sienter, same here. Open dumping of toxic waste cannot be reasonably considered to be an integral component of development because it's not an ordinary and reasonable component of development. Are you conceding that this integral component test actually applies under Maryland law? We would concede that Maryland law recognizes the integral component doctrine. It absolutely does not apply here because this is not an integral component. Your opposing counsel, if I'm remembering the brief correctly, says with regard to this Hickman case that the tombstones that were removed were not necessary for that particular project. But in this case, if there's no fill, there's no place to expand the terminal. Therefore, the two cases are not comparable. Well, but that's wrong because the toxic waste was not an ordinary and reasonable means to provide fill. It was not an ordinary and reasonable means to facilitate expansion. It could have been done by an ordinary and reasonable means. It could have been done with... Wasn't that the choice of the marine terminal entity? I mean, they're the ones that made the contract with Honeywell or Honeywell's successors to put that stuff there. Well, only starting in 1967, and a majority of the fill was put in prior to 1967. But all that's well beyond the statute of repose. Your Honor, the intent is important under the statute. There has to be an intent to create an improvement, an intent to enhance value, and there has to be contemplated a positive relationship to the land and the occupants. Here, this toxic dumping fails all the tests. It's useful to analyze the intent in two periods. From the 1940s, and the dumping began at least by then, but from the 1940s up to 67 when the sale was made, and then again from 67 to 76 when the dumping ceased. Now, in 67, Honeywell irresponsibly sold this land, knowing that it would cause great harm and endanger human lives, and knowing that it would be developed, and without warning the state. And so from 1940s to 1967 when they sold, Honeywell does not even allege any intent. They don't allege any intent to improve the land. In fact, they never allege that they themselves intended to improve land. In fact, they couldn't because of their scienter. Now, from 1967 to 76, they latch on to the intent of the state, which had been duped by Honeywell into buying the land. No reasonable purchaser would ever have purchased this land for the purpose of development, knowing that this copper landmass was carcinogenic and posed a threat of enormous magnitude to health and the environment. Well, that suggests that the state might have a claim for damages against the entity that dumped the material, but how does that affect the statute of repose? It vitiates the state's intent. The intent was formed as a result of being duped by Honeywell. Honeywell knew that this was a terribly dangerous situation, and it duped the state into— But the fact remains that there exists an improvement in that area of the landmass in terms of the expansion of the terminal. You don't dispute that that occurred, right? I'm sorry, that the sale occurred? No, that the terminal was expanded as a result of the, as you call it, the dumping of this material onto the landfill. The state attempted—what they did was they—it's like a big parking lot. So they paved over this copper-created landmass, and then it, for many years, it heaved. It's this process, when it mixes with the groundwater, the copper causes the concrete to heave up and break. So it wasn't even useful for that purpose. I'd like to make the point that the majority was dumped before the sale. And as the record shows, when Honeywell pawned off the 85 acres of copper landmass to the state in 1967, there was 85 acres of landmass. And that's in defendant's brief at page 25. But when the dumping ended in 1976, there had, by that time, been created 148 acres of copper-created landmass. And when you do the math, 85 acres divided by 148 equals a little more than 57 percent. And so a clear majority was dumped before the 1967 sale. And how is that relevant to the analysis? Well, to the extent that the state relies on the state's duped intent, that duped intent only applies to a minority of what was dumped. Are you suggesting that there should be a bifurcated analysis with respect to the statute proposed? I think it's very useful to analyze this in terms of the point in time before Honeywell alleges any intent whatsoever and the point in time after Honeywell starts to begin to allege intent, which began only in 1967, where they latch onto the intent of the state. Well, how is it useful? I guess you say that, but tell me how it's useful. How does it get you to where you need to be? Well, there was absolutely no intent prior to 1967. And then after 1967, the intent was, again, as a result of the uninformed and as a result of the concealment of the dangerous condition by Honeywell, it's only then that the property would have been bought. No reasonable purchaser would have bought otherwise. And so this intent to use this carcinogenic material as fill was as a result of it. That's not a legitimate basis to find that this was truly an improvement to real property. The integral component doctrine cases illustrate what can and cannot qualify as an improvement. And toxic dumping is very much like the graveyard desecration. It's simply not a reasonably necessary component of development to use toxic fill. Again, the integral component case of the Pippin in the Fourth Circuit, the wooden utility pole, that, by contrast, was considered an integral component because it was an ordinary and reasonable means to elevate electrical lines up off the ground to keep people safe from electrocution. And so it satisfied the test. The test is it must relate positively to both the land and to the occupants. And, in fact, in Pippin, the pole had a most positive relationship to the people by keeping them from being electrocuted. It enhanced value because it facilitated the electrical project. And it had a most positive relationship. And it was intended to have a positive relationship. Here, Honeywell never intended a positive relationship. And, again, the state, when it comes onto the picture for a minority of the dumping period, its intent was ill-informed because of the concealment of the known danger by Honeywell. And then to allow Honeywell to come along and take advantage of all this and say, well, no, this is really quality fill, and we're entitled to call this an improvement now, is really turning the statute on its head. You point to the graveyard desecration case as being analogous to this, but I don't know that it's on all fours. And I'm wondering if you see whether you or your opponent have considered or see any benefit in having the particular set of circumstances here considered in the first instance by the Maryland State Court of Appeals via certification, just because this seems to be a very unusual set of facts. Do you see any benefit in that? Your Honor, I believe that either of the two courts, the two very high courts, the Fourth Circuit and the Maryland Court of Appeals, could both be extremely well-equipped to apply the common sense analysis that's required here. And this is not such an issue that has never been considered before. There are several cases to inform in this instance what is and what is not an improvement and how the common sense application is to be applied. As far as Hickman, there are basically two reasons the court relied on. One, it was not desecration of tombstones. It's not a reasonably necessary component. The term reasonable comes up in these analyses very commonly, both in Pippin. It was not an ordinary – I'm sorry, in Pippin, it was an ordinary and reasonable means to elevate the electrical lines. In Hickman, it was a – Was that the language used in the case? Yes, Your Honor, I'm quoting. From Pippin, it was, quote, unquote, ordinary and reasonable, end quote, to elevate the electrical lines up off the ground to keep people safe. There was argument in that case that it would have been preferable to keep them underground. And the court said, no, it doesn't have to be the only way. As long as it's an ordinary and reasonable way to do it, it can qualify as an integral component. And then in Hickman, the language, in quotes, is reasonably necessary component, end quote, of development. And so here – so there's two reasons in Hickman. One, removing – desecrating tombstones is not a reasonably necessary component of development. And secondly, it was even prohibited. And the same situation is here. So we do believe it is analogous. Here, the – it's not necessary. It seemed like time. You've reserved some time in rebuttal. Thank you, Your Honor. Thank you very much. Mr. Daneker. Thank you, Your Honor. Michael Daneker on behalf of Honeywell. May it please the court. The question before this court is whether Maryland's 20-year statute of repose applicable to property improvements precludes the likeling plaintiff's tort claims. Judge Bennett in the district court ruled that it does. Because that question comes before this court on a successful Rule 12b-6 motion to dismiss, this court's review is de novo with the facts taken as alleged in the second amended complaint and documents attached to or referenced in that complaint. In CTS Court v. Wahlberger, the Supreme Court explained that statutes of repose affect a legislative judgment that a defendant should be free from liability after a legislatively determined amount of time. The point of these statutes is to protect defendants and the courts from cases where the search for truth has become stale or prejudiced by the loss of evidence, whether it's the death of witnesses or the disappearance of documents or other things that happen over time. Because a statute of repose is a legislative grant of immunity, any analysis of its application has to start with the plain language of the statute itself. Here, Maryland's statute of repose has a general blanket prohibition that's applicable. The statute states, quote, no cause of action for damages accrues when wrongful death results from an unsafe or defective condition of an improvement to real property that occurs more than 20 years after the date the entire improvement first becomes available for its intended use. If we look at the criteria of that statute, there's no dispute that the likeling plaintiffs have brought a cause of action for wrongful death and seek damages. Similarly, there's no dispute that with respect to the time requirement, that more than- What was the intended use prior to 1967? The intended use prior to 1967 was to transform the land from marshland into dry land by depositing this copra fill. One part of the definition in Rose v. Foxpools says there's several prongs to the definition of an improvement that the Maryland Court of Appeals adopted in Rose v. Foxpools. And one prong of it is whether an item is intended- So from the 1930s forward, the dumping by Honeywell was intended to improve the land? Was, in fact, changing the land from marshland to dry land, just like if the Army Corps dredges dredge spoils and places them, for example, on an island in the Chesapeake in order to create new land, they are, in fact, transforming the land. And that fits the- Well, that might have been the result, but was that the intent? Does that matter? I believe the intent was twofold. And, again, I'm looking at the second amended complaint. The first is that the Fells Point facility had to dispose of this material somewhere. It was generating a soil-like byproduct, the copper, that they needed to move off of the Fells Point facility. The second is they chose to place it here because they were placing it in marshland and creating dry land. And so they could have placed it anywhere. They placed it here for that purpose. Is it just because of the nature of the material that would it matter where they would have placed it? You seem to be saying that just because of the nature and consistency of this material that was being dumped, no matter where it went, it would have been an improvement to land. Or is that saying too much? I think that's saying too much. I think saying that material like this historically in industry, materials that are high-quantity, soil-like byproducts, were generally used as fill all over the Northeast and the United States. You're going without a complaint there, aren't you? Yes, I am. Okay. Here, what Honeywell was doing was, what Honeywell's predecessors were doing, was taking a material like this, which the complaint makes clear is a high-quantity material, and placing it on marshland in order to both dispose of it and to transform that land. And then once the 1967 contract with the Maryland Port Authority is entered into, that transformation, that adaptation of the land to a new and further purpose, is subsumed into the additional placement in order to create the expansion to the Dundalk Marine Terminal. Where do we find in the record that prior to 1967 the purpose was in part to transform the land? The record states, and you find it in several places, is that this fill was placed on marshland. Where? So the first place you can find it is in the 1967 contract, which says that the land that's being conveyed has riparian rights associated with it. The second place that it's found is in the 1992 consent order that the second amended complaint references. And in the 1992 consent order, it notes that the land that has been filled in is adjacent to the Patapsco River, is adjacent to sediments that have to be investigated, and that the fill material, that runoff from the fill material into the river also has to be investigated. And the third place is in the first complaint and the first amended complaint, where there are allegations early on in that complaint that Honeywell placed this fill in order to reclaim marshland. So if we look at the definition of an improvement in Rose versus Foxpools, the definition that the Maryland Court of Appeals has adopted is that an improvement is, quote, a valuable addition made to property or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance the value, beauty, or utility, or to adapt it to new and further purposes. I want to spend some time on that third prong. Here, the 1967 contract is instructed. The contract states that Allied, Honeywell's predecessor, was required to place up to a million cubic yards of fill on the property between 1967 and 1976, and that if Allied didn't, it had to pay a penalty of 18.25 cents for every ton that it came up short. The contract's preamble also states that the purpose of the contract was to allow for the expansion of the Dundalk Marine Terminal. In addition, on the second prong. How does the relative knowledge of the parties here implicate this analysis? I mean, your opponent suggests that had the state understood the nature of the toxic material that was being dumped in this area, that they would never have entered into this contract. No reasonable landowner would have accepted the terms of this agreement. How is that, if at all, relevant? Your Honor, I believe that that's not relevant. The question of, and I'll assume for a moment because the Second Amendment complaint alleges it, that Allied did have knowledge of some of the dangers, but the question of whether knowledge is relevant to the statute of repose can be answered first by the terms of the statute itself. There's no knowledge exception in the statute. It's a blanket prohibition with a number of discrete exceptions, each of which is uniquely tailored, none of which pertain to knowledge. Second, this issue was addressed in a brief discussion in Rose v. Fox Pools. There, the Rose plaintiffs argued that their causes of action arose not from the underlying defect of swimming pool, but from a failure to warn about the defect. That is, that the defendants had knowledge of the defect and failed to warn. And what the Rose court held was that even causes of action like failure to warn are governed by the statute of repose because the statute applies to allegedly unsafe and defective conditions in an improvement, and in order to demonstrate things like failure to warn or misrepresentation or fraudulent concealment, you have to prove that there was, in fact, an unsafe or defective condition in an improvement. I think the third point on that is that the only case that my opponents cite on this issue is a Rhode Island case, Rhode Island v. Lead Industries, interpreting a very different statute where I believe the holding is not consistent with their argument. In that case, the court was looking at a statute that applied to contractors and material men. What it said was that a pigment manufacturer, who then sold a lead pigment to paint manufacturers, who then sold paint to a contractor, who then constructed a residential development, wasn't really a material man and that that chain was so far attenuated that the pigment didn't constitute an improvement. The other contention that your opponent makes is that this is akin to graveyard desecration in the sense that it, like that, was illegal at the time, which I guess is a point of contention. So tell me how that, why this is different. So I'd like to address that in two stages. The first is that my opponents rely on the Hickman case to address, to make that, and I don't think Hickman creates an absolute bar or prohibition on things that might have been illegal being deemed improvements. If it did, if either Hickman, if it did, it would be contrary to the plain language of the statute and it would mean that, for example, an electrician who put in faulty wiring that didn't meet building code wouldn't be protected by the statute. But if I read Hickman carefully, I think what Hickman actually said was that the removal of the gravestones, that is the taking of something away from the land, which doesn't meet the Rose definition, the Rose definition requires an addition to the land, the removal was not an improvement. And then it went on to say things like the construction of drainage canals and the construction of underground utility lines and the regrading of the property were all improvements and those are much more like the placement of the copra fill. And Hickman then even went so far in the discussion to say the extension of a graveyard, even though it doesn't enhance the value of the land, can be considered an improvement because the extension of a graveyard adapts the land to new and further purposes, just like the copra fill does. So I think Hickman is useful, but it doesn't, because it says there's a common usage, common sense test just like Rose did, but it doesn't create any kind of absolute prohibition. Does your case require that we accept that Maryland law has adopted the integral component doctrine in order for your appeal to succeed? Is that necessary? Our argument is twofold. The answer is it's not necessary. The first argument is the fill in and of itself is an improvement because the fill was intended to adapt the land to new and further purposes. That's what the 1967 contract makes clear and that the fill before that was subsumed into that purpose. Our second argument is that regardless of whether the fill is in and of itself an improvement, it is an integral component in the Dundalk Marine Terminal and that expansion, which created berths and cranes and storage areas, in fact, it created the very economic activity that gave rise to Mr. Leikling's job, that expansion was clearly an improvement. Is it clear in Hickman that the Maryland Court of Appeals actually accepted or adopted the integral component doctrine or simply assumed it for purposes of that case? I believe that the Maryland Court of Appeals discussed it favorably and assumed it in part of its analysis in Hickman and that this court in Pippin has looked at the Pippin question in the context of integral component as well and explained that Maryland has an integral component test. So there is a quote in Pippin where this court explains the integral component. So your view is that Maryland has accepted the integral component doctrine? Yes, sir, that's my view. Thank you. So to come back to the second part of your question, Judge, about whether there's a question of illegality here and to answer that, I don't think we can read the second amended complaint and come to any conclusion with respect to whether there is or is not, whether the COPR was illegal, and indeed I think there's nothing that would support a finding that the placement of the COPR fill was illegal at the time. And if I can run through each of the allegations in the complaint, but it's suffice it to say that none of them give rise to a finding of illegality. I take it your argument is under a statute of repose that doesn't make any difference. That is the first argument, is that under a statute of repose that doesn't make any difference. It's not within the language. There's no exception for illegality in the general bar and it's not within the carefully defined or crafted exceptions. Well, I guess I suppose the answer is also there may be some other sanctions that might attach to that, but the statute of repose is not the remedy. There may well be other sanctions, including the obligation to conduct environmental remediation, which Honeywell is already under with consent orders to the Maryland State, with the State of Maryland. Well, let me ask, I'll ask the same question I asked of your colleague, and I think I know what your answer is going to be, is if you see any benefit in certifying this case to the Maryland Court of Appeals. It is a rather unusual set of facts, and at least with respect to the integral component doctrine, it's not clear to me that the Maryland Court of Appeals has actually adopted it. They seem to have accepted it for purposes of Hickman. What's your take on that? I mean, obviously we can and will decide the case, but it seems to me it would be a rather unique question of state law that might be better suited for the experts. I believe this court is capable of deciding the case. I appreciate your confidence. Thank you. I didn't mean to suggest otherwise. But I think that the Rose versus Foxpools case lays out the common usage test, lays out a clear definition of improvement, that Hickman contains a discussion of the integral component doctrine that's sufficient to conclude that the Maryland courts have adopted the integral component doctrine and that the questions of fact are not so unique or so unusual that it requires certification to the Maryland Court of Appeals. Let me address my opponent's argument that because the COPER was allegedly hazardous, that that alleged hazard, to a certain extent, precludes the application of the statute of repose. I think, again, here the plain language of the statute does not support that assertion. There's no carve-out for a hazardous substance or something that's allegedly hazardous. Indeed, when they argue that the COPER was hazardous, what they're arguing is that it was unsafe and defective, and that's precisely what the general prohibition is intended to apply to. Second, the Maryland legislature knows how to carve hazardous or harmful substances out of the statute of repose if it would choose to do so. In fact, in 1991, the legislature amended the statute to carve out claims related to asbestos products and asbestos manufacturers. And if you look at that carve-out, that's a very narrow carve-out. It's one of the exceptions listed in subprong D of the statute, and it has a number of sub-exceptions to it, but each one of them is very specifically related to asbestos. And not to more general things like hazardous substances or toxic substances or pollutants. And in fact, the governor's chief legislative officer testified at the time that that amendment to the statute of repose was intended only to apply to asbestos, and that it would be left to future legislatures to choose to extend it to other hazardous substances if they wished to do so. So going back through, we've touched on most of the items I wanted to cover with the court. I wanted to make just a few additional points looking at the definition of an improvement in Rose versus Foxpools. And that one of them is that the Pippin case is really instructive here. In that case, the court considered whether a utility pole that was constructed on a vacant piece of property constituted an improvement. And at the time it was constructed, the utility pole didn't provide any electricity to the land it was constructed on. It provided electricity to an adjacent piece of land. And the argument there was that it couldn't be an improvement because it didn't enhance the value of the land on which it was constructed or because it didn't provide any use for the land on which it was constructed. And what the Pippin court found was that it was an improvement because the mere construction of that utility pole, despite the fact that there was no intent to enhance the value of the land on which it was constructed, that construction adapted the land to new and further purposes. It changed the use of the land from land that was essentially vacant to land over which electricity was transmitted. And that is similar to what we're talking about here. Well, except that the utility pole doesn't have any negative connotations associated with it like a toxic dump. Well, except that the allegations were that the utility pole was in fact effective. And so it did have. It was what? It was defective. The tort claims rose from the fact that the utility pole was not a perfect utility pole and that the argument was but for a defect in the pole, it's falling down and killing the plaintiff would not have occurred. So while the allegations of defect are different, both improvements come with allocations of a defect. So let me just sum up by saying that we believe that the statute of repose was adopted in response to the abolition of the doctrine of privity and in response to the implementation of the discovery rule on statutes of limitations. And so it is intended to act as an absolute bar. And here, that statute of repose applies both to the COPER fill in and of itself and to the COPER fill as an integral component of the Dundalk Marine Terminal. If there are no more questions, thank you for your time. Thank you very much. Counsel, you have some time left in rebuttal. Thank you, Your Honors. In fact, Pippin found that there was an intent to improve the first parcel by facilitating later development. And that goes to Judge Thacker's question about whether this transformed the land and it was ever intended to transform the land in a positive way. And counsel pointed to the plaintiff's complaint. And, in fact, what the plaintiff's complaint does is it describes this activity as creating a hazardous waste dump. And that's in the joint appendix at 136. That's the second amended complaint? Yes, Your Honor. I think opposing counsel referenced the first complaint and the first amended complaint when he said that there were allegations there about reclaiming using the COPER fill to reclaim the land. And that's at paragraph 10 of the first amended complaint. I think that's what counsel was referring to. I could be wrong. These allegations have to be taken in the light most favorable to the plaintiff on 12B6 and we call it a hazardous waste dump in the second amended complaint. Yes, he did remove the words reclaimed after the first amended complaint. What's your response, counsel, to opposing counsel's argument and the wording of the Maryland statute that takes the general application but then carves out a specific exception for asbestos? Yes, Your Honor. We seek no exception. An exception would say, okay, this item is granted an improvement, but it should be exempted from coverage. And we don't – that's not our argument. What our argument is it does not qualify as an improvement. Under Honeywell's faulty reasoning, every harmful item other than asbestos would be subject to the statute of repose, even if it did not qualify as an improvement. And what that reasoning overlooks is the essential requirement that it must qualify,  So the – just like in – You can have asbestos in the form of roofing, for instance, which most people would say is an improvement to a structure, but it's taken outside of the statute of repose even though it is an improvement. Correct, Your Honor, under the exception. But that does not mean that everything else that's harmful is exempted from – or is not exempted. That doesn't mean that everything that's harmful or unsafe is not exempted from the statute. The activity here was at all times prohibited, and this dovetails with the desecration in Hickman. Under the 1899 Rivers and Harbors Act, which Honeywell asked the court to ignore, this was prohibited activity. And it was prohibited even without scienter, even without knowing that it was toxic. It would still have been prohibited under Rivers and Harbors Act, which prohibits any refuse going into navigable waters, such as the Sapsco River and its marshland. Now, Honeywell says we didn't preserve that argument, but that it was prohibited. But, in fact, we did at A137 and A139. Violations of various statutes were alleged. In their brief, they said, well, these statutes are not timely. They weren't in effect then. And so then in rebuttal, in our reply brief, that's where we cited the Rivers and Harbors Act. And, of course, the court is presumed to know and apply the law, and so that statute is pertinent. It should be applied. So the only place you've cited the Rivers and Harbors Act is in your reply brief? Correct, Your Honor. If you want to wrap up very quickly. Yes, thank you, Your Honor. The Honeywell cites no case that toxic dumping of hazardous waste can be considered an improvement to real property under any common sense interpretation. No case at all. And that's really what this comes down to is the common sense application and a hazardous waste dump that was only intended to create a hazardous waste dump for many, many years, cannot reasonably be considered an improvement to real property. Thank you, Your Honors. Thank you very much. We'll come down and greet counsel and move on to our next case.
judges: G. Steven Agee, Albert Diaz, Stephanie D. Thacker